Case 6:18-cv-00087-NKM-RSB   Document 21   Filed 02/20/20   Page 1 of 16
Pageid#: 1474

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
2/20/2020
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
    DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# LYNCHBURG DIVISION

| | |
|---|---|
| **JENNY F.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 6:18–CV–0087 |
| | ) |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Jenny F. ("Jenny") filed this action challenging the final decision of the Commissioner of Social Security finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f; R. 15–43. Jenny alleges that the Administrative Law Judge ("ALJ") erred by concluding that she had not been under a disability since September 14, 2012. Specifically, Jenny claims that the ALJ (1) failed to properly evaluate her mental impairments under SSR 96–8p, (2) failed to consider all of her medically determinable impairments in developing her RFC, (3) did not complete a function–by–function assessment when developing the RFC, (4) improperly gave little weight to the opinion of her treating physicians, and (5) failed to assess her subjective allegations correctly. I conclude that the ALJ did not account for her moderate limitation in concentration, persistence, or pace and, thus, I **RECOMMEND PARTIALLY GRANTING** Jenny's Motion for Summary Judgment (Dkt. 14), **DENYING** the Commissioner's Motion for Summary Judgment (Dkt. 16), and **REMANDING** the case for further proceedings.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Jenny failed to demonstrate that she was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"). See also Monroe v. Colvin, 826 F.3d. 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## CLAIM HISTORY

On October 29, 2014, Jenny filed a Title II application for a period of disability and DIB and a Title XVI application for SSI, both alleging disability beginning September 14, 2012. R.

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

257–269. Jenny alleged disability due to back, knee, hand, bladder, and foot impairments; high blood pressure; and depression and anxiety. R. 287. The agency denied the claim initially and on reconsideration. R. 140–145, 152–165. The ALJ convened a hearing on April 11, 2017, at which Jenny and a vocational expert appeared and testified. R. 50–77.

On September 19, 2017, the ALJ issued a decision analyzing Jenny's claims under the familiar five–step process[3] and denying her claim for benefits. R. 15–43. The ALJ found that Jenny met the insured status requirements through December 31, 2017 and had not engaged in substantial gainful activity since the alleged onset date of September 14, 2012. R. 17. The ALJ found Jenny to have the severe impairments of left knee degenerative joint disease and chondromalacia; lumbar spine degenerative disc disease; obesity; generalized arthralgia; s/p ureteral surgeries; history of substance abuse; anxiety disorder; and depressive disorder. Id. Next, the ALJ determined that Jenny did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. R. 18–19. The ALJ determined Jenny to have a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing herself. R. 19–21.

The ALJ then found that Jenny had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can stand and walk

---

[3] The five–step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

no more than one hour in an eight–hour workday; can sit for six to eight hours in an eight–hour workday; can understand, carry out, and remember simple instructions; can respond appropriately to supervision, co–workers, and usual work situations; can deal with changes in a routine work setting; can never crawl, climb or kneel; requires one to two brief unscheduled restroom breaks each week; may require up to one day per month on average of unscheduled absences; and needs the opportunity to alternate between standing and sitting positions as desired two to three times between scheduled breaks. R. 21–22.

The ALJ next determined that Jenny could not perform any past relevant work including as a fast food worker, a short order cook, and a kitchen helper. R. 41. 42.  The ALJ identified jobs in significant numbers in the national economy that Jenny could perform including positions as an assembler, stuffer, and gauger. R. 42–43. Finally, the ALJ concluded that Jenny had not been under a disability since September 14, 2012. R. 43. On September 28, 2018, the Appeals Council denied Jenny's request for review. R. 1–7.

## **ANALYSIS**

Jenny challenges the ALJ's evaluation of her mental impairments and claims that the ALJ did not correctly analyze the opinion evidence or the assessment of her allegations.

### A. Mental Health Evidence

Jenny has received treatment from Rockbridge Area Community Services for various mental health conditions including depression, anxiety, post–traumatic stress disorder, and sleep apnea since February 2011, over a year–and–a–half before the alleged disability onset date. R. 1035. The records of Everett Luder, M.D., from February 2011 through September 2012 reflect that Jenny used marijuana regularly, had a wide–ranging affect from markedly restricted to much brighter, frequently cried, had moods from moderately depressed to euthymic, and had a high

level of co–morbid anxiety. R. 620–625. Dr. Luder prescribed several medications including Wellbutrin, Buspar, Pristiq, and lithium carbonate but none more than temporarily alleviated Jenny's symptoms. R. 615–622. Dr. Luder noted consistent improvements in Jenny's major depressive disorder through September 15, 2011, but reported on December 15, 2011, that she had become quite depressed again. Id.

On October 4, 2012, Jenny reported discontinuing all psychotropic medications after becoming pregnant, and Dr. Luder indicated that he would wait until after Jenny had her child to assess the need to resume her medication. R. 613–614. Between October 22, 2012 and November 18, 2013, Lia Bruner, M.D., at Augusta Health Internal Medicine diagnosed Jenny with sleep apnea and moderately severe depression for which she increased Jenny's dosage of Zoloft. R. 388–393, 427–430, 434–439.

From October 2013 to at least December 2015, Jenny sought counseling and medication management for depression from Jeannette Schoonmaker, M.D., at Rockbridge Area Community Services. Jenny denied substance abuse, but Dr. Schoonmaker on April 3, 2014 diagnosed her with conditions including cocaine dependence and cannabis abuse. R. 596–598, 605–608. Dr. Schoonmaker consistently diagnosed Jenny with depression and described her as exhibiting a sad mood, a sad affect, and anxiety, and prescribed medications to treat these conditions. R. 585–608, 1105–1110, 1112–1113. Dr. Schoonmaker also found that Jenny displayed a congruent or blunt affect; a good mood; intact memory, concentration, and attention; and cognitive functioning at baseline levels. R. 592–594, 599–604, 823–825, 1112–1113. On September 16, 2015 session, Dr. Schoonmaker noted that objective clinical findings were unremarkable apart from Jenny's sad mood. R. 1108–1110. Dr. Schoonmaker reached a similar conclusion after a December 16, 2015 session. R. 1105–1107.

From March 2016 to January 2017, Jenny continued seeking treatment at medication management sessions at Rockbridge Area Community Services, first with Vanessa Carroll, M.D., and then with Michael Tyler, M.D. R. 1067–1104. Both doctors consistently diagnosed Jenny with depression, anxiety, cocaine dependence, cannabis abuse, obesity, problems with primary support group, and economic problems. Id. On multiple occasions, both doctors noted unremarkable clinical findings aside from Jenny's sad mood despite Jenny describing suffering from multiple conditions. R. 1076–1078, 1082–1097, 1101–1104. However, each doctor on other occasions made clinical findings notable for depressed mood and constricted affect. R. 1067–1069, 1079–1081, 1247–1249. Dr. Tyler described Jenny as in remission from substance abuse. R. 1067–1069.

Throughout her treatment for mental health conditions, Jenny repeatedly denied suicidal or homicidal ideation, self–injurious thoughts or behaviors, paranoid delusions, and hallucinations. R. 586, 589, 597, 600, 603, 1067–1068, 1076–1077, 1083, 1087, 1091, 1095, 1106, 1109, 1113.

### B. Physical Health Evidence

#### a. Conditions affecting gait and the left knee

Jenny has suffered from conditions in her feet and knees that have affected her gait and coordination. On May 6, 2012, Jenny visited the emergency room at Stonewall Jackson Hospital with right ankle pain from an ankle sprain. R. 720–723. On October 22, 2012, Jenny sought treatment for back pain from Augusta Health Internal Medicine, where Dr. Bruner noted bilaterally diminished knee jerk reflexes. R. 434. On August 13, 2013, Jenny returned to the emergency room with complaints of back and neck pain. R. 686–689. There, she was diagnosed with sciatica and knee sprain/strain. Id. On August 19, 2013, Jenny again returned to the

emergency room with complaints of back and leg pain. R. 442–443. Upon examination, Bradley Cashion, M.D., found that Jenny had a mildly antalgic gait but could walk on her toes and the balls of her feet without difficulty. Id. Dr. Cashion diagnosed Jenny with lumbago and piriformis syndrome and identified the source of her pain chronic musculoskeletal strain as obesity exacerbated by her pregnancy. Id. At a November 18, 2013 office visit, Dr. Bruner again diagnosed Jenny with back and knee pain. R. 378–383.

On August 20, 2013, Jenny saw Edward Hemphill, M.D., an orthopedic surgeon who found that Jenny had inflammation and early arthritis of the left knee. R. 441. Between September and October 2013, Dr. Hemphill performed an arthroscopic washout and debridement on Jenny's left knee, administered injections on Jenny's left knee, and diagnosed her with chondromalacia and synovitis of the left knee. R. 634, 644–645, 1037, 1039. On October 30, 2013, Jenny returned to Dr. Hemphill with complaints of buckling of the left knee. Dr. Hemphill found diffuse sensitivity and trace effusion of the left knee and referred Jenny to physical therapy. R. 637. On November 24, 2014, Jenny reported that she had "good relief and good use of [her left] knee" since her knee scope. R. 646. On February 10, 2015, Dr. Hemphill diagnosed early arthritic change in the left knee that was slowly improving with therapy. R. 650. Dr. Hemphill continued to note left knee pain and arthritis as well as left ankle swelling and tenderness with limited improvement through October 2015. R. 646, 648, 831–832, 1033, 1056. In an October 7, 2015 letter, Dr. Hemphill described Jenny as having "great difficulty" climbing stairs, and, on October 21, 2015, he referred Jenny for bariatric surgery to get her to a point where she could have a partial knee replacement. R. 1033, 1056.

From 2014 to 2015, Jenny sought treatment from Jane Sailer, M.D., at Maury River Family Practice. R. 809–813, 995, 997, 999. Dr. Sailer repeatedly described Jenny as walking

7

with a normal gait, even in the aftermath of Jenny slipping on a wet floor. R. 811–812, 997, 999. On March 3, 2015, Jenny received treatment by phone from Dr. Hemphill for an ankle sprain. R. 654. Dr. Hemphill instructed Jenny to use crutches for non–weight bearing for 48 hours, elevate her foot to help with swelling, and wear a Velcro ankle split after weight bearing. R. 654.[4]

In 2016 and 2017, Jenny sought treatment from Robert Burke, P.A., who first noted that Jenny retained normal balance and gait. R. 1261. However, he later noted that Jenny used a walker and that she had antalgic gait. He diagnosed Jenny with left–sided sciatica and piriformis syndrome. R. 1301–1318. On February 28, 2017, Ruzbeh Toussi, D.O., gave Jenny a piriformis injection. R. 1319, 1327.

### b. Back Conditions

Jenny has struggled with back pain for which she has received conservative therapy. R. 427–430, 434–439, 445, 713–715, 811–812, 995–1000. Reports from Rey A. Lao, P.T., in February 2013 indicate that Jenny received limited relief from physical therapy. R. 692–693, 697–700. On March 5, 2013, Heidi M. Carr, N.P., indicated that Jenny suffered from acute arm pain and lumbago that may derive from pathology in the cervical spine. R. 424–426. However, x–rays of the lumbar spine and cervical spine performed in March 2013 showed no significant abnormality. R. 464–466. That same month, Dr. Hemphill noted malalignment and tenderness over the paraspinal musculature of the cervical spine and referred Jenny for an EMG study of the upper extremities. R. 417, 419, 446. In the rest of 2013, X–rays, an MRI, and a note by Dr.

---

[4] The ALJ appears to have mismatched this treatment record with the caption of a record of emergency room treatment provided by Randy A. Gallagher, D.O., on February 28, 2015 that appears on the same page of the evidentiary record. See R. 654. The ALJ thus incorrectly attributed the medical opinion of Dr. Hemphill to Dr. Gallagher. R. 38. While I do not find this mistake to justify remand, I direct the ALJ on remand to reconsider the weight assigned to this opinion, as one reason the ALJ cited for giving it little weight was that Dr. Gallagher only treated Jenny once, whereas the actual practitioner, Dr. Hemphill, has treated her many times.

Bruner continued to show issues related to Jenny's back and lumbar spine. R. 378–383, 453–457, 459–460.

On August 28, 2014, Dr. Sailer described Jenny's back pain as caused by lumbar disc disease which limited her capacity for sustained sitting, walking, and lifting, and determined that Jenny was not able to participate in the workforce. R. 1021–1022.

### c. Carpal Tunnel Syndrome

Dr. Bruner diagnosed Jenny with bilateral carpal tunnel syndrome on February 4, 2013 and noted symptoms ranging from numbness, soreness, and nerve irritation. R. 389–423, 427–430. In November 2013, Dr. Bruner described Jenny's carpal tunnel syndrome as a contributing factor to Jenny being unable to work (R. 378), but, on March 26, 2014, Dr. Bruner described Jenny's carpal tunnel syndrome as "mostly resolved." R. 361.

Dr. Hemphill diagnosed Jenny with carpal tunnel syndrome on February 6, 2013. R. 628. On July 18, 2013, Dr. Hemphill injected Jenny's right hand, which reduced her pain. R. 631. Dr. Hemphill performed a right carpal tunnel release surgery on April 23, 2015 and a left carpal tunnel release on April 14, 2016. R. 1050, 1061–1062, 1192. Dr. Hemphill described Jenny as neurovascularly intact and stable and as healing nicely at a follow–up appointment after the first surgery. R. 1001–1002, 1028–1029.

### C. Opinion Evidence

On August 30, 2013, Dr. Bruner gave the opinion that Jenny's lower back pain, left knee pain, and depression prevented her from sitting, standing, bending, or squatting for more than fifteen minutes and rendered her unable to participate in employment or training activities for six months. R. 1019–1020.

In a July 2, 2015 Statement of Ability to do Work–Related Activities (Mental), Dr. Schoonmaker, Jenny's primary physician, found that Jenny had a marked limitation in her ability to maintain concentration and pace and a moderate limitation in her ability to understand, remember, and carry out both simple and detailed instructions, and make judgments on simple work–related decisions. R. 1023–1024. Dr. Schoonmaker found that Jenny would miss three days of work because of her chronic pain and depression, which manifest as sleep disturbance, fatigue, and anhedonia. Id.

In an April 10, 2017 Statement of Ability to do Work–Related Activities (Mental), Dr. Tyler, also at the Rockbridge Community Services, found that Jenny had a mild limitation in carrying out short, simple instructions; a moderate limitation in her ability to understand and remember short, simple instructions; a marked limitation in her ability to maintain concentration and pace; and extreme limitations in her abilities to understand, remember, and carry out detailed instructions, make judgments on simple work–related decisions, and interact appropriately with the public. R. 1329–1330. Dr. Tyler concluded that Jenny's anxiety and depression would cause her to miss three days of work a month. Id. He related this opinion back to 2013. Id.

In a letter presented to the Appeals Council dated November 29, 2017, Angela Wheeler, B.S., Jenny's case manager at Rockbridge Area Community Services, described Jenny's difficulty being around groups of people including family members and the limited success of a variety of medications to control her depression. R. 9. According to Ms. Wheeler, Jenny could not sit or stand for extended periods and "would have great difficulty keeping gainful employment." Id.

10

### D. Opinions of State Consultative Examiners[5]

State consultative examiner Richard Surrusco, M.D., found Jenny to have the severe impairments of dysfunction – major joints, spine disorders, and obesity. R. 78–88. He found Jenny had the functional capacity to lift and/or carry ten pounds, occasionally lift and/or carry twenty pounds, sit about six hours in an eight–hour workday, stand and/or walk about six hours in an eight–hour workday, and occasionally climb ramps/stairs, kneel, crouch, and crawl. R. 85–86. Dr. Surrusco limited Jenny to light work but found her not disabled. R. 87–88.

On August 27, 2015, state consultative examiner Eugene Noland, M.D., determined that Jenny had the functional capacity to frequently lift and/or carry ten pounds, occasionally lift and/or carry twenty pounds, sit about six hours in an eight–hour workday, and stand and/or walk about three hours in an eight–hour workday. R. 113–115. Dr. Noland further limited Jenny to occasional use of the left lower extremity for operation of foot controls; no crawling or climbing ladders, no ropes or scaffolds; occasional kneeling, crouching, and climbing of ramps and stairs; avoiding even moderate exposure to hazards such as machinery and heights; and no performance of jobs that involve concentrated exposure to vibration, wetness, humidity, or temperature extremes. R. 115–117. Dr. Noland limited Jenny to sedentary work but found her not disabled. R. 118.

On March 31, 2015, state consultative examiner Howard Leizer, Ph.D., determined Jenny's affective disorders and anxiety disorders were non–severe and did not cause any restriction in activities of daily living, difficulties in maintaining social functioning, or repeated episodes of decompensation of extended duration. R. 83–84. R. 84. Dr. Leizer determined Jenny to have mild difficulties in maintaining concentration, persistence, or pace. R. 84.

---

[5] I note here that the record appears to contain two identical copies of the initial level and reconsideration level opinions of the state agency consultative examiners. See R. 78–139.

On August 27, 2015, state consultative examiner Hillery Lake, M.D., determined that Jenny had severe impairments of affective disorders and anxiety disorders and that she had suffered no extended episodes of decompensation; had no restriction of activities of daily living; and had moderate difficulties in sustaining social functioning and concentration, persistence, or pace. R. 111–112. However, Dr. Lake found that she had moderate limitations in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co–workers or peers without distracting them or exhibiting behavioral extremes, perform at a consistent pace without an unreasonable number and length of rest periods, and complete a normal workday and workweek without interruptions from psychologically–based symptoms. R. 112–117.

**E. The ALJ's Evaluation of Jenny's Mental Impairments**

Jenny argues that the ALJ failed in his duty under SSR 96–8p to provide an adequate explanation as to how the RFC limitation to understanding, carrying out, and remembering simple instructions addresses her moderate limitation in concentration, persistence, or pace. Jenny also challenges the ALJ's failure to adopt the opinion of Dr. Lake that she has moderate difficulties in maintaining social functioning despite giving it some weight.

SSR 96–8p requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10–cv–2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR

96–8P, 1996 WL 374184, at *7 (1996); Meadows v. Astrue, No. 5:11–cv–63, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9–cv–2545, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often). In Mascio v. Colvin, the Fourth Circuit clarified the ALJ's duty of explanation to adequately review the evidence and explain the disability decision. 780 F.3d 632, 636 (4th Cir. 2015). The ALJ has the responsibility to address the evidence of record that supports his conclusions. See Panna v. Colvin, No. 1:15cv229, 2015 WL 5714403, at *3 (W.D.N.C. Aug. 31, 2015) (remanding because "the ALJ failed to address [the claimant's] limitations in social functioning or explain why these limitations in social functioning did not translate to work related limitations in Plaintiff's RFC" like what is required by Mascio in concentration, persistence or pace cases); see also Fauber v. Colvin, No. 6:15–CV–16, 2016 WL 8736904, at *5 (W.D. Va. Aug. 12, 2016) (applying Mascio to a plaintiff's claim that the ALJ failed to account for his moderate limitations in social functioning in the RFC). While Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, it does underscore the ALJ's duty to adequately review the evidence and explain the decision. See also Monroe, 826 F.3d at 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing evidence he found credible and specifically applying the law to the record).

    Here, the ALJ determined in step three that Jenny had a moderate impairment with regard to concentrating, persisting, or maintaining pace. R. 20. In reaching this conclusion, the ALJ

cited medical evidence as showing that Jenny generally did not complain to treating practitioners of serious difficulty in this area, Jenny often reporting adequate symptom control from psychiatric medications, mental status examination results showing Jenny to have no serious problem completing serial 7s and other calculations, treating practitioners not observing that Jenny as overly distractible or slow, Jenny reporting watching television and reading books to her pre–school age daughter, and Jenny performing daily tasks such as driving a car, doing laundry, and checking her Facebook account. Id.

In step four, the ALJ recounted in detail Jenny's relevant medical history and evaluated the opinion evidence. R. 21–41. The ALJ gave little weight to the mental health opinion of Dr. Leizer for failing to account for the severity of Jenny's depression and anxiety and not having a regular treating relationship with her. R. 37. The ALJ gave some weight to the mental opinion of Dr. Lake, who identified a moderate difficulty in maintaining concentration, persistence, or pace. Id. The ALJ gave little weight to the opinions of Drs. Bruner, Sailer, Schoonmaker, and Tyler, all of which addressed Jenny's mental health impairments. R. 37–39. Several of these opinions found limitations in Jenny's ability to understand, remember, and carry out simple instructions; to understand, remember, and carry out detailed instructions; and to maintain concentration and pace. Id. The ALJ noted how Jenny's allegations of significant mental symptoms such as poor memory and concentration contrasted with treatment notes of practitioners usually showing that her mental status was normal outside of routine findings such as depressed mood and affect. R. 40. The ALJ addressed Jenny's mental health impairments in the RFC by including limitations that Jenny can understand, carry out, and remember simple instructions; can respond appropriately to supervision, co–workers, and usual work situations; and can deal with changes in a routine work setting. R. 21.

Here, the ALJ provided no reasoning or explanation as to how the RFC accommodates Jenny's moderate impairment with concentration, persistence and pace, and it is not clear from the record what evidence the ALJ relied upon to reach that conclusion. See Mascio, 780 F.3d 638. The ALJ thoroughly described the evidence and assessed the medical opinions, but never related how Jenny could perform work despite her moderate impairment with concentration, persistence or pace. Further, the ALJ did not rely on any medical opinions that stated that Jenny could perform work within the restrictions he identified despite a moderate impairment with concentration, persistence and pace.

Overall, the ALJ's opinion has no discussion to support the conclusion that, despite her moderate limitation in concentration, persistence, or pace, Jenny is capable of performing work within the limitations the ALJ included in the RFC. Thus, as in Mascio, this court is "left to guess about how the ALJ arrived at his conclusions." 780 F.3d at 637. The ALJ may be able to explain why Jenny's moderate limitations with maintaining concentration, persistence, and pace do not require corresponding restrictions in her RFC. His failure to do so in this case, however, is reversible error and requires remand. See id.; Nelson v. Berryhill, No: 7:15–cv–573, 2017 WL 782938, at *5 (W.D. Va. Feb. 28, 2017); Nichols v. Colvin, No. 7:15–cv–44, 2016 WL 4529780, at *3–*4 (W.D. Va. Aug. 3, 2016); White v. Colvin, No. 4:14–CV–00018, 2015 WL 1958885, at *12 (W.D. Va. May 1, 2015). Regardless of evidence contained in the record, the ALJ must sufficiently articulate his findings such that the district court can undertake a meaningful review. Monroe, 826 F.3d at 189 (quoting Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013)) ("a necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling, including a discussion of which evidence that ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence"). Thus, this matter

15

should be remanded with instructions to the Commissioner to properly account for Jenny's moderate limitation with concentration, persistence and pace.[6]

## CONCLUSION

For the foregoing reasons, I **RECOMMEND PARTIALLY GRANTING** Jenny's motion for summary judgment, **DENYING** the Commissioner's motion for summary judgment, and **REMANDING** the case to the ALJ for further consideration.

The Clerk is directed to transmit the record in this case to Norman K. Moon, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

      Enter: February 20, 2020

*Robert S. Ballou*

      Robert S. Ballou
      United States Magistrate Judge

---

[6] Because I find that remand is warranted based on the ALJ's failure to include a narrative discussion regarding how the RFC addresses Jenny's moderate impairment in concentration, persistence, or pace, I will not address Jenny's additional allegations of error. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the Commissioner should take into consideration Jenny's remaining allegations of error.